**IN THE UNITED STATES DISTRICT COURT**
**FOR THE SOUTHERN DISTRICT OF ALABAMA**
**SOUTHERN DIVISION**

| | |
|---|---|
| **JEROME WILLIAMS,** *et al.*, | ) |
| | ) |
| **Plaintiffs,** | ) |
| | ) |
| **v.** | )   **CIVIL ACTION 06-0799-WS-B** |
| | ) |
| **SAXON MORTGAGE SERVICES,** | ) |
| **INC.,** *et al.*, | ) |
| | ) |
| **Defendants.** | ) |

**ORDER**

This matter is before the Court on Defendant Ticor Title Insurance Company of Florida's Motion to Dismiss Second Amended Complaint (doc. 62).[1]  The Motion has been briefed and is ripe for disposition at this time.[2]

**I.     Background.**

Plaintiffs Jerome Williams, Linda Williams, and Claude Williams, Sr. brought this action as a result of a real estate loan transaction involving defendants Homeowners Loan Corporation ("HLC"), Saxon Mortgage Services, Inc. ("Saxon"), and Ticor Title Insurance Company of Florida ("Ticor").  According to the Second Amended Complaint (doc. 61), plaintiffs obtained a home mortgage loan from defendant HLC on or about March 30, 2005.  (Doc. 61, ¶ 6.) Nonparty Swafford Settlement Services ("Swafford") acted as the closing agent on the loan and also as defendant Ticor's agent, and Ticor issued a title insurance policy to the lender.  (*Id.*)

_____

[1]      Under the E-Government Act of 2002, this is a written opinion and therefore is available electronically.  However, it has been entered only to decide the motion or matter addressed herein and is not intended for official publication or to serve as precedent.

[2]      At the close of briefing, plaintiffs filed a Request for Oral Argument (doc. 82) on the Motion to Dismiss.  Pursuant to Local Rule 7.3, the Court in its discretion may rule on any motion without oral argument.  After careful consideration of the parties' voluminous briefs (which exceed 80 pages, in the aggregate), the undersigned is of the opinion that oral argument would not be of substantial assistance in resolving the issues presented in the Motion. Accordingly, plaintiffs' Request for Oral Argument (doc. 82) is **denied**.

Following the closing, HLC assigned the loan to defendant Saxon, which presently holds and services the loan. (*Id.*) This action arises from certain disclosures made by, and certain charges levied by, defendants in connection with this real estate transaction.

The Second Amended Complaint enumerates four causes of action. In Count I, plaintiffs maintain that HLC and Saxon are liable under the Truth in Lending Act, 15 U.S.C. §§ 1601 *et seq.* ("TILA"), because the disclosures made in connection with the closing understated the finance charge by omitting certain fees, such as a $375 fee paid to Swafford for "Abstract or Title Search," a $225 fee paid to Swafford for "Title Examination," a $200 title insurance premium paid to Ticor, and a $120 fee for recording the mortgage in probate court. (Doc. 61, ¶¶ 12, 34.)[3] Plaintiffs contend that these omissions resulted in an understatement of the finance charge, entitling plaintiffs to rescind the mortgage and to collect damages. In Count II, plaintiffs allege that HLC and Saxon violated the Home Ownership and Equity Protection Act, 15 U.S.C. §§ 1602(aa) and 1639 ("HOEPA"), which imposes certain requirements on lenders with respect to high-rate mortgages. The Second Amended Complaint alleges that the Williamses' loan qualified as a high-rate mortgage because the total points and fees exceeded 8% of the loan amount, and that HLC and Saxon violated HOEPA by failing to provide required disclosures and by imposing pre-payment penalties and a due-on-demand clause. (Doc. 61, ¶¶ 10, 40-46.) On that basis, plaintiffs seek damages, rescission of the transaction, and other relief.[4]

Counts III and IV are leveled exclusively at Ticor, and purport to assert claims under the Real Estate Settlement Procedures Act, 12 U.S.C. §§ 2601 *et seq.* ("RESPA"). In particular, Count III alleges that the $200 charge assessed against the Williamses as a title insurance premium for a lender title insurance policy exceeds the maximum premium of $102.50 allowed

---

[3]     To place these amounts in context, plaintiffs allege that the TILA disclosures provided at closing reflected that the total amount financed was $37,104 and that the total finance charge was $98,137.18, including a prepaid finance charge in the amount of $2,946. (Doc. 61, ¶ 11.) The gravamen of plaintiffs' TILA claims is that the listed finance charge was understated by $920 because the particular items listed above were omitted from that calculation.

[4]     Defendants HLC and Saxon have answered, and the viability of the claims against them is not called into doubt by Ticor's Motion to Dismiss; therefore, Counts I and II will not be addressed further herein.

by the Alabama Department of Insurance, and that such excessive fee was split between Ticor and Swafford.  As a result, plaintiffs allege, Ticor is in violation of RESPA for having given or accepted a portion of a charge made or received for real estate settlement services other than for services actually rendered.  Count IV is substantively identical to Count III, except that it is brought on behalf of a putative class of similarly situated residential mortgage borrowers in the State of Alabama and any other state in which regulatory bodies set maximum title insurance rates.

Ticor now moves to dismiss Counts III and IV pursuant to Rule 12(b)(6), Fed.R.Civ.P., on the grounds that RESPA does not create a right of action for charges that allegedly violate Alabama's title insurance regulatory system, that such claims are precluded by operation of the filed rate doctrine, and that the claims are untimely under the one-year statute of limitations applicable to RESPA claims.

## II.    Legal Standard.

On a motion to dismiss for failure to state a claim upon which relief can be granted, the Court must view the complaint in the light most favorable to the plaintiff.  *Hill v. White*, 321 F.3d 1334, 1335 (11th Cir. 2003).  Thus, "all facts set forth in the plaintiff's complaint are to be accepted as true and the court limits its consideration to the pleadings and exhibits attached thereto."  *Grossman v. Nationsbank, N.A.*, 225 F.3d 1228, 1231 (11th Cir. 2000) (citation omitted).  The rules of pleading require only that a complaint contain "a short and plain statement of the claim showing that the pleader is entitled to relief."  Rule 8(a)(2), Fed.R.Civ.P. As the Supreme Court recently observed, while a complaint attacked by a Rule 12(b)(6) motion need not be buttressed by detailed factual allegations, the plaintiff's pleading obligation "requires more than labels and conclusions, and a formulaic recitation of the elements of a cause of action will not do."  *Bell Atlantic Corp. v. Twombly*, --- U.S. ----, 127 S.Ct. 1955, 1964-65 (2007).  The rules of pleading do "not require heightened fact pleading of specifics, but only enough facts to state a claim for relief that is plausible on its face."  *Id.* at 1974.  The Court's inquiry at this stage focuses on whether the challenged pleadings "give the defendant fair notice of what the plaintiff's claim is and the grounds upon which it rests." *Conley v. Gibson*, 355 U.S. 41, 47, 78 S.Ct. 99, 2 L.Ed.2d 80 (1957).  Thus, a plaintiff must meet only an "exceedingly low" threshold to withstand a Rule 12(b)(6) motion.  *United States v. Baxter Int'l, Inc.*, 345 F.3d 866,

881 (11th Cir. 2003).

## III.    Analysis.

### A.        The Contours of Section 8(b).

The principal ground for the Rule 12(b)(6) motion is Ticor's contention that plaintiffs'
claims that the $200 title insurance premium exceeded the maximum amount authorized by
Alabama law are not actionable under RESPA.  These claims are brought pursuant to Section
8(b) of RESPA, which provides as follows:

> "No person shall give and no person shall accept any portion, split, or percentage
> of any charge made or received for the rendering of a real estate settlement
> service in connection with a transaction involving a federally related mortgage
> loan other than for services actually performed."

12 U.S.C. § 2607(b).  The case law is unequivocal that Section 8(b) was not intended as, and
should not be interpreted as, a price-control statute.  *See, e.g., Kruse v. Wells Fargo Home
Mortg., Inc.*, 383 F.3d 49, 57 (2nd Cir. 2004) ("Congress did not intend section 8(b) to serve as a
price-control mechanism"); *Krzalic v. Republic Title Co.*, 314 F.3d 875, 880-81 (7th Cir. 2002)
(emphasizing that RESPA "is not a price-control statute" and "places no ceiling on the amount
that a closing agent can charge for its services"); *Boulware v. Crossland Mortg. Corp.*, 291 F.3d
261, 268 (4th Cir. 2002) ("RESPA was meant to address certain practices, not enact broad price
controls.").  As one district court recently put it, "Congress did not intend to turn federal courts
into roving equity tribunals over real estate closings when it enacted RESPA."  *Williams v.
Berkshire Financial Group, Inc.*, --- F. Supp.2d ----, 2007 WL 1677760, *5 (E.D.N.Y. June 11,
2007).  Rather, the purpose of Section 8(b) "is to prohibit kickback and referral fee
arrangements, not to convert every violation of a loan agreement into a violation of [RESPA]."
*Duggan v. Independent Mortg. Corp.*, 670 F. Supp. 652, 654 (E.D. Va. 1987) (citation omitted).[5]

The plain text of Section 8(b) reflects that what is forbidden is the giving or accepting of
a charge "other than for services actually performed" in the real estate settlement transaction.
*See Sosa v. Chase Manhattan Mortg. Corp.*, 348 F.3d 979, 981 (11th Cir. 2003) ("Subsection 8(b)

---

[5]        *See also Haug v. Bank of America, N.A.*, 317 F.3d 832, 836 (8th Cir. 2003)
("Section 8(b) is an anti-kickback provision"); *Weizeorick v. ABN AMRO Mortg. Group, Inc.*,
337 F.3d 827, 830 (7th Cir. 2003) (characterizing Section 8(b) as "an anti-kickback measure");
*Krzalic*, 314 F.3d at 879 (noting that section 8(b) targets "commercial bribery").

-4-

attempts to close any loopholes by prohibiting any person from giving or accepting any part of a fee unless services were actually performed."); *see generally Weizeorick v. ABN AMRO Mortg. Group, Inc.*, 337 F.3d 827, 830 (7th Cir. 2003) (Section 8(b) is violated when a real estate settlement fee is split or kicked back to a third party who performs no service). In other words, Section 8(b) "prohibits the receipt of a portion of a fee paid for real estate services without actually performing the service," *Weizeorick*, 337 F.3d at 829, and also prohibits giving part of a fee to another entity that performed no services to earn such a fee. *See Sosa*, 348 F.3d at 982 (determining that Section 8(b) operates to create two separate prohibitions, including both accepting a portion of a charge and giving a portion of a charge).

> **B.     The Sufficiency of the Complaint.**

A fair reading of the Second Amended Complaint reveals that the Williamses have alleged fee-splitting conduct involving defendant Ticor and nonparty Swafford. Plaintiffs allege that they were charged a $200 title insurance premium at closing. (Doc. 61, ¶ 12.) This charge was allegedly "marked up" from a lower figure, and that "mark-up" was split between Ticor (the title insurer) and Swafford (the closing agent and the alleged agent of Ticor). (*Id.*, ¶ 54.) Plaintiffs also plead an allegation that the $200 charge exceeded the agreed-upon charge between Ticor and Swafford. (*Id.*, ¶ 55.) According to plaintiffs, no services were performed for the markup of that title insurance fee. (*Id.*, ¶¶ 54-55.) Construed in the light most favorable to plaintiffs, as they must be for Rule 12(b)(6) purposes, these allegations support the following narrative: Ticor and Swafford agreed or arranged that Swafford would serve as Ticor's agent at closing. Ticor quoted Swafford a premium for a title insurance policy for the lender, in response to which Swafford tacked on an additional surcharge in order to reach the $200 sum charged to the Williamses. Swafford did not provide any services or perform any work in providing title insurance to the lender (although Ticor clearly did because it issued the requisite policy). Yet Swafford collected the $200 fee from the Williamses at closing – including both the actual title insurance premium and the markup – and split the markup with Ticor.[6] Under this set of facts,

---

[6]     The Second Amended Complaint does not delineate this fact pattern with crystalline clarity. Nonetheless, it is certainly a reasonable inference from the well-pleaded allegations of the Complaint, which is sufficient for Rule 12(b)(6) purposes. *See, e.g., Garfield v. NDC Health Corp.*, 466 F.3d 1255, 1261 (11th Cir. 2006) ("At the motion to dismiss stage, all

Swafford has marked up a title insurance fee, even though Swafford has performed no work and provided no services in relation to that title insurance premium, and has split this markup with Ticor, the entity that actually provided the services.

So far, so good.  But the fundamental problem for plaintiffs in bringing RESPA claims against Ticor is this: Section 8(b) does not forbid settlement service providers from receiving any fees overcharged by a third party.  To the contrary, that statute goes no further than to forbid any person from giving or accepting any portion, split or percentage of a charge other than for services actually performed.  This means that Ticor cannot give a part of a charge to Swafford other than for services that Swafford actually performed, and that Ticor cannot accept a part of a charge other than for services that Ticor actually performed.  Such a construction is fully consistent with the anti-kickback objective of Section 8(b).

As set out in the above narrative, however, Ticor did not give Swafford anything; rather, under plaintiffs' own interpretation of the Complaint, Swafford inflated the title insurance premium fee and gave part of it to Ticor.  (Plaintiffs' Response (doc. 73), at 7.)[7]  Ticor is alleged to have accepted a part of the inflated $200 fee from Swafford, but RESPA does not forbid a defendant from accepting any and all inflated fees.  Rather, it merely prohibits a defendant from accepting any portion of a charge other than for services actually performed.  Ticor unquestionably performed the services to which that title insurance fee related, inasmuch as

_____

well-pleaded facts are accepted as true, and the reasonable inferences therefrom are construed in the light most favorable to the plaintiff.") (citation omitted).  Moreover, plaintiffs embrace this scenario in their brief, wherein they characterize the $200 charge as containing "both the premium and an additional unearned charge. ... The settlement agent took the premium and added a charge which does not represent any work performed. ... Plaintiffs allege that this charge is split between Ticor and its agent Swafford."  (Plaintiffs' Response (doc. 73), at 7.)  Elsewhere in their brief, plaintiffs reinforce the point by theorizing that "[i]t is as if the settlement service provider took  the title insurer's stated charge and added to it without performing any additional service."  (*Id.* at 11.)

[7]       There is no allegation or suggestion in the Second Amended Complaint that Ticor received the entire $200 fee, then kicked back a portion of it to Swafford.  The RESPA analysis might be different in that case, because then Ticor would have given a split fee to Swafford even though Swafford provided no services in relation to the title insurance premium charge.  But that scenario is not presented by the Second Amended Complaint, and plaintiffs do not maintain otherwise in their briefs.

-6-

Ticor issued the title insurance policy to which that fee corresponded.  Thus, the conduct for which the Williamses seek redress from Ticor under RESPA is that Ticor allegedly accepted too much money for the service of providing a lender title insurance policy in the Williams transaction.[8]  This is not a violation of RESPA, because Ticor actually performed the services to which the title insurance premium fee related.[9]

>      ### C.      *The Effect of* **Morrisette.**

In arguing to the contrary, plaintiffs would have this Court subdivide the $200 fee into a portion as to which services were rendered by Ticor, and another portion as to which services were not rendered by Ticor.  Plaintiffs propose to use Ticor's filed rate with the Alabama regulatory authorities as the line of demarcation separating the portion of the title insurance premium that qualifies as "earned," from that which is deemed "unearned."  Indeed, plaintiffs contend that they have properly stated a claim under Section 8(b) simply by alleging "that Ticor provided no service for the portion of the charge which represents a payment for something other than the insurance itself."  (Plaintiffs' Response (doc. 73), at 8.)  Plaintiffs slice too finely,

---

[8]      The Second Amended Complaint clearly alleges this theory by stating that this title insurance premium fee was "unreasonable and exceeded the costs or value of the services actually provided."  (Doc. 61, ¶ 20.)  Thus, the Williamses do not contend that they were charged for a service never given, and do not dispute that Ticor actually provided the title insurance policy to which the $200 premium related.

[9]      The deficiencies in plaintiffs' allegations are highlighted by contrasting them with those at issue in *Weizeorick v. ABN AMRO Mort. Group, Inc.*, 337 F.3d 827 (7th Cir. 2003), which sufficiently alleged a split of fees between a title insurer and a closing agent to withstand Rule 12(b)(6) review.  In *Weizeorick*, the complaint supported an inference that the plaintiffs paid certain fees for recording the release of the mortgage, and that the closing agent paid the title insurer $10 from those recording fees.  *Id.* at 829, 832.  The closing agent had earned the recording fees by recording the release of the mortgage.  As to the title insurer, however, the fee was unearned because the title insurer had allegedly performed no services relating to the recording process.  Thus, the *Weizeorick* court reversed the district court's grant of the title insurer's motion to dismiss, finding that the plaintiffs had adequately stated a claim under Section 8(b) by alleging that the closing agent had recorded the release, such that "the $10.00 fee collected by [the title insurer] may have been unearned and therefore their complaint satisfies the statutory requirement."  *Id.* at 833.  Here, by contrast, the fee in question relates to the provision of title insurance services, which Ticor unquestionably provided, such that any fees pertaining to those title insurance services are earned, at least as to Ticor.

drawing arbitrary distinctions and applying hollow semantic labels that suit their purpose. The undersigned recently considered and rejected this very argument in *Morrisette v. NovaStar Home Mortgage, Inc.*, 484 F. Supp.2d 1227 (S.D. Ala. 2007), which addressed this contention as follows:

> "[W]hat the plaintiffs challenge is the amount of a fee charged by a provider of services .... "Whatever its size, such a fee is 'for' the services rendered by the institution and received by the borrower." *Kruse*, 383 F.3d at 56. Finding the dividing line between a proper amount and an improper excess may be easier in the case of a filed rate, but the effort is still nothing more than an attempt to rein in costs of a service simply because they are deemed too high, and "Congress did not intend section 8(b) to serve as a price-control mechanism." *Id.* at 57."

*Morrisette*, 484 F. Supp.2d at 1230.

Other courts have reached like conclusions. *See Santiago v. GMAC Mortg. Group, Inc.*, 417 F.3d 384, 387 (3rd Cir. 2005) (rejecting plaintiff's reading of section 8(b) that "would require dividing charges for services provided into 'reasonable' and 'unreasonable' portions - that is, the portion for 'services rendered' and the portion for 'no services rendered,'" reasoning that the statute makes no such distinction); *Kruse*, 383 F.3d at 56 (nothing in the language of Section 8(b) "authorizes courts to divide a 'charge' into what they or some other person or entity deems to be 'reasonable' and 'unreasonable' components"). This reasoning is fatal to plaintiffs' contention that the title insurance premium fee should somehow be fragmented or apportioned into one sum labeled "earned" and another sum labeled "unearned," so as to enable plaintiffs to pursue RESPA claims based on Ticor's receipt of the "unearned" portion. The fee as a whole clearly related to services actually performed by Ticor, so Section 8(b) is inapplicable. This Court will not engage in the wholly artificial, line-drawing exercise of designating some portion of that fee to be an excessive charge as to which Ticor performed no services, and plaintiffs have failed to identify a single case where such a sifting process has been indulged. Simply put, plaintiffs were charged $200 for a title insurance premium. Ticor provided title insurance services. As such, Ticor's receipt of an allegedly excessive payment for those services may have been an overcharge, but it was still a payment for services that were actually performed. RESPA does not speak to, much less outlaw, such conduct.

The *Morrisette* decision also relied on *Sosa*, wherein the Eleventh Circuit affirmed the dismissal of a Section 8(b) claim brought against a mortgage lender for charging $50 for courier

fees, only a portion of which was paid to the couriers themselves.  The Eleventh Circuit reasoned that the plaintiffs could not credibly allege that the lender had "performed no services that would justify its retention of a portion of the fee" when it was undisputed that the lender had arranged to have items delivered to complete the closing, thereby performing services with respect to the courier fee.  348 F.3d at 983.  Were the Williamses correct, *Sosa* would have been decided differently, because the $50 courier fee could have been divided into a portion that the lender actually earned by arranging courier services and a portion that was unearned, and hence violative of Section 8(b).  Such an outcome would produce a slippery slope under which every charge made by a real estate settlement provider could be allocated into "earned" and "unearned" segments.  In that event, every purportedly excessive or unreasonable charge would become actionable under RESPA, effectively metamorphosing the statute into the very price-control act that it most emphatically is not.  *See Martinez v. Wells Fargo Bank, N.A.*, 2007 WL 963965, *5 (N.D. Cal. Mar. 30, 2007) ("any argument that an overcharge contains an unearned fee component boils down to a complaint that the settlement service provider's profit is too high, enforcement of which necessarily requires a price control mechanism").  This Court cannot accept plaintiffs' proposed construction of RESPA that would broaden the statute's reach so expansively beyond the borders that Congress intended and that courts have recognized.[10]

### D.     Plaintiffs' Arguments.

In response, plaintiffs insist that *Morrisette* was wrongly decided because it places too much weight on a false distinction between "markups" and "overcharges," rather than on the

---

[10]     Nor can plaintiffs take solace by seizing on *Sosa*'s language that "[w]hat is missing is an allegation that the portion of the charge that [the lender] retained was accepted other than for services actually performed, i.e., that [the lender] performed no services that would justify its retention of a portion of the fee."  348 F.3d at 983 (internal quotations omitted). It is true enough that the Williamses have made such an allegation here by alleging that the $200 insurance premium "constituted a charge other than a fee for services actually performed." (Doc. 61, ¶¶ 54, 55.)  But elsewhere in the Second Amended Complaint, plaintiffs acknowledge that title insurance policy services were actually provided, although the value of those services was less than the $200 fee charged.  (*Id.*, ¶ 20.)  Thus, the Second Amended Complaint does not allege that Ticor provided no title insurance policy services, which are the very services to which the $200 premium relates, but rather maintains that Ticor received an excessive fee for providing those services.

plain language of Section 8(b).[11]  The Court disagrees.  To be sure, the terms "markup" and "overcharge" are not found in the text of that statute, but *Morrisette* is one of a substantial line of authorities that relies on those concepts to distinguish between the types of charges that are forbidden by Section 8(b) and those that are not.  *See, e.g., Sosa*, 348 F.3d at 983 (explaining that Section 8(b) is violated when a party marks up the charge of another settlement provider); *Santiago*, 417 F.3d at 386-89 (opining that Section 8(b) does not include a cause of action for overcharges but does provide a cause of action for markups); *Kruse*, 383 F.3d at 55-62 (similar).  Far from being divorced from the statutory language, these concepts accurately capture and embody the circumstances in which the plain language of Section 8(b) does and does not apply.  If a plaintiff is complaining about an overcharge, then Section 8(b) is not implicated because the settlement service provider in fact provided some service in exchange for the fee, even if the fee is alleged to be too high or unreasonable in some way.  If the plaintiff is complaining about a markup, then Section 8(b) is in play because the service provider provided no service at all in exchange for the fee received.  The Williamses are complaining that Ticor received excessive compensation for the title insurance services it provided, which is clearly an overcharge claim and clearly falls outside the reach of Section 8(b).[12]

---

[11]     As one recent district court case succinctly put it, "a markup occurs when the settlement service provider hires a third party to provide the service, adding no value itself to the service, and then passes along to the borrower the third party's charge after increasing it by some amount. An overcharge, in contrast, is where the settlement provider performs or claims to perform the service internally, and then charges an amount that the borrower challenges as unreasonable or illegal." *Williams v. Berkshire Financial Group, Inc.*, --- F. Supp.2d ----, 2007 WL 1677760, *3 n.4 (E.D.N.Y. June 11, 2007).

[12]     Nor is it persuasive to argue, as plaintiffs do, that their claims differ from the "overcharge" paradigm because the charge at issue here is alleged to be objectively unreasonable, rather than subjectively unreasonable.  Plaintiffs reason that the Court need not resort to amorphous, arbitrary distinctions to separate out the reasonable portion of the title insurance premium from the unreasonable portion, because the portion of the title fee that exceeds Ticor's filed rate with Alabama's Department of Insurance is *per se* unreasonable and excessive.  Regardless of whether plaintiffs' claim is characterized as one of objective unreasonableness or subjective unreasonableness, the inescapable fact is that they are claiming that Ticor accepted too much money for the title insurance services it provided.  Thus, plaintiffs are complaining about an overcharge, which Section 8(b) manifestly does not prohibit.  That plaintiffs champion the availability of a handy tool to distill the reasonable portion from the

Plaintiffs also criticize *Morrisette* for refusing to adopt the HUD Statement of Policy 2001-1, 66 Fed.Reg. 53052 (Oct. 18, 2001), wherein HUD opined that Section 8(b) applies where two persons split a fee for settlement services, "any portion of which is unearned," and that it also applies when a service provider charges a fee that "is in excess of the reasonable value of the goods or facilities provided or the services actually performed."  66 Fed.Reg. at 53059.  This policy statement has been rejected by a number of courts as contrary to the plain language of Section 8(b).  *See, e.g., Santiago*, 417 F.3d at 387 ("[B]ecause the plain language of Section 8(b) does not provide for a cause of action for overcharges, it is not necessary for us to reach the question whether HUD's interpretation warrants deference."); *Kruse*, 383 F.3d at 57 (declaring that it could not, and therefore would not, defer to HUD's reading of Section 8(b)); *Krzalic*, 314 F.3d at 881 ("There is not enough play in the statutory joints to allow HUD to impose its own 'interpretation' [of Section 8(b)] under the aegis of *Chevron*."); *Boulware*, 291 F.3d at 267 (no deference to HUD guidance is appropriate because the text of Section 8(b) is unambiguous, and therefore controls).  This Court agrees with and joins those authorities in finding that HUD's policy statement is entitled to no deference with respect to Section 8(b).[13]

## IV.   Conclusion.

For all of the foregoing reasons, the undersigned concludes that the Williamses' claims against Ticor are beyond the purview of RESPA, which is not a price-control act and which does not forbid real estate settlement providers from receiving excessive charges for the services they

---

excessive portion of the charge does not establish the propriety of performing such a distillation process in the first place.

[13]     Plaintiffs posit that, pursuant to *Heimmermann v. First Union Mortg. Corp.*, 305 F.3d 1257 (11th Cir. 2002), that policy statement "must be given the full force of the law" in this Circuit.  (Plaintiffs' Brief, at 13.)  This contention misconstrues *Heimmermann*, which goes no further than to accord deference to the aspect of HUD's 2001 policy statement dealing with yield- spread premiums.  305 F.3d at 1262; *see also Krzalic*, 314 F.3d at 882 ("It is no surprise that *Heimmermann* ... dealt with the part of the 2001-1 statement that concerns yield-spread premiums.").  Nothing in *Heimmermann* can be reasonably read as a determination by the Eleventh Circuit that the provisions of the 2001 policy statement interpreting Section 8(b) are entitled to deference.  *See Sosa*, 348 F.3d at 984 (declining to address whether *Chevron* deference attaches to HUD's interpretation of Rule 8(b)).

provide.[14]  Accordingly, Ticor's Motion to Dismiss (doc. 62) is **granted**, and Counts III and IV of the Second Amended Complaint are **dismissed**.  There being no further claims against Ticor, the Clerk's Office is directed to terminate Ticor as a defendant in this action.  This action will proceed as to plaintiffs' claims against defendants Saxon and HLC.

DONE and ORDERED this 23rd day of June, 2007.


s/ WILLIAM H. STEELE
UNITED STATES DISTRICT JUDGE

---

[14]      In light of this determination, the Court need not and does not reach Ticor's alternative grounds for dismissal, relating to the filed rate doctrine and the statute of limitations.