**IN THE UNITED STATES DISTRICT COURT**
**FOR THE SOUTHERN DISTRICT OF ALABAMA**
**SOUTHERN DIVISION**

| | | |
|---|---|---|
| **JEROME WILLIAMS, LINDA WILLIAMS** | ) | |
| **and CLAUDE WILLIAMS, SR., individually** | ) | |
| **and on behalf of others similarly** | ) | |
| **situated** | ) | |
| | ) | |
| **Plaintiffs,** | ) | |
| | ) | |
| **v.** | ) | **CASE NUMBER:  06-799** |
| | ) | |
| **SAXON MORTGAGE COMPANY ET AL.,** | ) | |
| | ) | |
| **Defendants.** | ) | |

**PLAINTIFFS' RESPONSE TO MOTION FOR SUMMARY JUDGMENT FILED BY**
**HOMEOWNERS LOAN CORPORATION**

COME NOW Plaintiffs and submit the following Memorandum in response and opposition

to the Motion for Summary Judgment filed by Defendant Homeowners Loan Corporation ("HLC")

(Doc. 122):

**INTRODUCTION AND SUMMARY OF ARGUMENT**

Plaintiffs hold a substantive right to rescind their loan and they have properly exercised that

right.  This right is created by the plain language of TILA and the particular circumstances of the

loan.  HLC does not address in its motion the substantive issue of whether the right to rescind exists,

nor does it seek summary judgment on that issue.  Instead, HLC seeks dismissal of the rescission

claim based solely on its speculation that Plaintiffs will not be able to satisfy whatever tender amount

this Court eventually determines is due.  The relief sought by HLC would require that this Court use

is equitable powers to extinguish the Plaintiffs' substantive rescission right. This is inappropriate.

The relief sought by HLC is contrary to the plain language of Section 1635 and the Eleventh

Circuit's interpretation of this Court's power to deviate from the procedure set out in that section. Furthermore, the formation of any procedure by this Court at this stage is premature because the Court has yet to determine the facts and law necessary to fashion an appropriate remedy. Those necessary findings include (1) whether there exists a rescission right; (2) what credits are due from HLC to Plaintiffs; (3) the amount of tender due from Plaintiffs to HLC; (4) whether the equities require deviation from the procedure set out in Section 1635(b) and, if so, (5) what alternatives are appropriate under the circumstances.

## STATEMENT OF FACTS

Jerome Williams is a 45-year old life-long Mobile resident who works as the Maintenance Supervisor at Ladd-Peebles Stadium. He has worked all his adult life and with his salary, plus overtime, is fully able to provide for his family. He lives with his wife, Linda, and they both provide care for his 76-year old father, Claude, who is a stroke victim, at the family home. (See Affidavit of Jerome Williams, attached hereto as Exhibit "A.").

In early 2005, Mr. Williams received a solicitation from HLC offering him a money saving opportunity to refinance his existing mortgage. After speaking with the HLC representative over the phone, Mr. Williams, who is not experienced in mortgage loans, became convinced that the HLC loan was in the best financial interests of his family. What he did not know and was not told was that the loan peddled by HLC was a "high-cost" loan as defined by TILA containing several terms which are prohibited by that law, with an adjustable rate. (*Id*.).

The loan closing did not take place at an attorneys office or at a title company office. As is the common practice of subprime lenders, the closing of the loan took place at the Williams' home through a notary, who was not an HLC employee. (*Id.*)

2

What the Williams signed at their home was an adjustable rate loan with an interest rate starting at 8.99%.   That rate as reset several times since the closing.   The monthly payments were originally $321.97.  The payments are currently $531.  (*Id.*).

The amount of the Williams' loan was $40,050. (See the Promissory Note, attached hereto as Exhibit "B").  The disclosed "amount financed" was $37,104.  (See the TILA Disclosure, attached hereto as Exhibit "C").  Plaintiffs were charged settlement costs totaling $3,961.15, or 9.89% of the total loan amount.  (See HUD Settlement Statement, attached hereto as Exhibit "D").  Most of these closing costs constitute part for the "finance charge" which must be disclosed as such pursuant to the requirements of the Truth in Lending Act, 15 U.S.C. § 1600 et seq. ("TILA").

At closing, HLC generated an "Itemization of Amount Financed" which set out those fees which it was disclosing as part of the "finance charge," as well as the components of the "amount financed."  (See "Itemization of Amount Financed" attached hereto as Exhibit "E.")  The fees which were characterized by HLC as "finance charges" total $2,946.   These charges consist of the following:

| | |
|---|---|
| "Loan Origination Fee" (Line 801):[1] | $1,363 |
| "Tax Service Contract" Fee (Line 812): | 63 |
| "Administration Fee" (Line 810): | 295 |
| "Processing/Underwriting Fee" (Line 390): | 390 |
| "Funding Fee" (Line 809): | 365 |
| "Doc Prep Fee" (Line 811): | 195 |
| "Title Service Fee" (Line 1111): | 75 |
| "Closing Fee" (Line 1101): | 200 |

Total Finance Charges as Disclosed:          $2,946

In addition to the fee disclosed as finance charges by HLC, the Plaintiffs were also charged

---

[1]Each charge is listed with the corresponding line number, which refers to the listing of the charge on the HUD Settlement Statement (Exhibit "D.").

the following fees:

> -A fee paid to Swafford in the amount of $375 for "Abstract or Title Search." (HUD Line 1102)
>
> -A fee paid to Swafford in the amount of $225 for "Title Examination." (Line 1103)
>
> -Title insurance premium to Ticor Title Insurance Company in the amount of $200. (Line 1108)
>
> -Fee for recording of the mortgage in the Mobile County Probate Court in the amount of $120. (Line 1201)
>
> None of these fees were included in the finance charge or disclosed as such. (See Exhibit

"E").

The title examination and abstracting services were performed by a non-disclosed third party vendor, A & B Abstracting. The amount charged for the services actually rendered was $90. (See Invoices and related documents attached hereto as Exhibit "F"). Therefore, the title "abstract" and "examination" charges exceeded the true cost of the services actually provided by $510.

The $120 charge imposed for a "recording fee" greatly exceeded the actual fee paid to record the mortgage. As reflected on the last page of the recorded mortgage, the Office of the Judge of Probate ("Probate") charged the following in connection with the recording of the Plaintiffs' mortgage:

| | |
|---|---|
| Mortgage Tax | $ 60.15 |
| S.R. Fee | 2.00 |
| Surcharge | 10.00 |
| Recording Fees | 52.00 |
| TOTAL | $124.15 |

(See Exhibit "G"). Excluding the taxes (for which the Plaintiffs were charged separately), the actual

recording fee totaled $49.[2]  Thus, the recording fee was marked up by $71.

The amounts which a title insurance company may charge for title insurance premiums (including commissions) in Alabama are limited to the rates filed with and approved by the Alabama Department of Insurance.  Ala. Code §§ 27-25-1 through 10 (1975).  The insurance company and its title agent are prohibited by state law to charge an amount in excess of those filed rates for title insurance premiums.  The applicable filed rate for the policy issued in connection with the Plaintiffs' loan is $2.50 per $1,000 borrowed.  (See Exhibit "H").  For Plaintiffs' transaction, the legal rate was $101.25 ($2.50 x 40.5 = $101.25).  (*Id.*, p. 1).  The Williamses were charged $200 for title insurance, an amount which exceeded the legal rate by $98.75.

On December 29, 2006, Plaintiffs notified HLC by letter of their election to rescind the loan. The letter set out in detail the basis for their contention that the loan was rescindable. (See Exhibit "I").  HLC failed to respond to the notice of rescission.

## ARGUMENT

### PLAINTIFFS' LOAN IS A HOEPA "HIGH COST" LOAN SUBJECT TO A RIGHT OF RESCISSION.

Congress passed HOEPA in 1994 in response to increased abuses in the mortgage lending marketplace through high cost lending. S. Rep. No. 103-169 (1994), *reprinted in* 1994 U.S.C.C.A.N. 1881, 1912. "Borrowers across the country have been losing large amounts of home equity due to lenders inflating up front fees for the loan." *Id.*  Congress therefore imposed stricter prohibitions on loans with "total points and fees" which exceed 8% of the "total loan amount." 15 U.S.C. § 1602 (aa)(B). Once a loan is covered by HOEPA, it is subject to a laundry list of prohibited terms and

---

[2]Plaintiffs were separately charged $75.15 for "state tax/stamps: To the clerk of the Court." (See Exhibit "D").

5

notice requirements. 15 U.S.C. § 1639 (c) – (j).[3]

### The Points and Fees Charged to Plaintiffs

Points and Fees, as defined by 15 U.S.C. § 1602 (aa) (4) and Regulation Z, 12 C.F.R. § 226.32 (b) (1), include: (1) all Finance Charges as defined by Reg. Z § 226.4, except for actual interest payments, 15 U.S.C. § 1602 (aa) (4)(A); (2) all compensation paid to mortgage brokers; and, (3) all closing costs listed in 15 U.S.C. § 1605(e) except those which are "reasonable," and not paid to the lender or its affiliate. 15 U.S.C. § 1602(aa)(4)(C).

Finance Charges are broadly defined as "any charge payable directly or indirectly by the consumer and imposed directly or indirectly by the creditor as an incident to or a condition of the extension of credit." 15 U.S.C. § 1605 (a); 12 C.F.R. § 226.4(a). Despite this all-encompassing definition, certain real property related closing costs are permitted by 15 U.S.C. § 1605(e) to be excluded from the category of finance charge.  However, this exclusion only applies "if the fees are *bona fide* and reasonable in amount." Reg. Z § 226.4(c)(7). The "*bona fide* and reasonable" standard is included to prevent lenders from padding fees or adding charges without disclosing the additional expense as a finance charge.  Further, the real estate related fees can only be excluded from the Points and Fees category if those closing costs are reasonable, the creditor receives no direct or indirect compensation in connection with the charge, and the charge is not paid to an affiliate of the creditor. Reg. Z § 226.32(b)(1)(iii).

The bottomline of all this as it concerns the Williamses' loan is that the charges pertaining

---

[3] The regulations under TILA are issued by the Federal Reserve Board, which is the agency charged with promulgating regulations and interpretations of the Act. The Courts have granted Federal Reserve Board's guidance great deference in cases involving predatory lending. *See Ford Motor Credit Co. v. Milhollin*, 444 U.S. 555, 559-560 (1980); *Consumers Union, Inc. v. Federal Reserve Bd.*, 736 F. Supp. 337 (D.D.C. 1990); *Postow v. OBA Fed. Sav. Loan Ass'n*, 627 F.2d 1370, 1377 (D.C. Cir. 1980).

to title abstract, examination and title insurance are "finance charges" and, therefore, "points and fees," to the extent they were not *bona fide* or reasonable. The title examination and abstract fees are not *bona fide* or reasonable because they were marked up beyond the actual costs of the services provided. The fees charged were hidden profits to the closing agent; not legitimate fees for services actually rendered. As such, they are finance charges, at least to the extent of the markup. See, e.g., *Murry v. America's Mortg. Banc, Inc.*, 2004 WL 5010145 (N.D. Ill. 2004). The fee for title insurance is not *bona fide* or reasonable because it exceeds the amount allowed to be charged under state law. *Johnson v. Know Financial*, 2004 WL 1179335 (title insurance charge which exceeds the maximum amount allowed by state law is not reasonable or *bona fide*); *see, also*, *Strong v. Option One*, 2005 WL 1463245 (E.D. Pa. 2005)(same); *Stump v. WMC Mortg. Corp.,* 2005 WL 645238 (E.D.Pa. 2005); *Fields v. Option One Mortgage Corporation*, 2006 WL 2191342 (E.D. Pa. 2006)(title insurance fee unreasonable if plaintiff qualified for reissue rate mandated by filed-rate).

The extent to which a recording fee may be excluded from the computation of the finance charge is addressed in 15 U.S.C. 1605(d)(1). According to that provision, the following may be excluded from the computation of the finance charge:

> Fees and charges prescribed by law which actually are or will be paid to public officials for determining the existence of or for perfecting or releasing or satisfying any security related to he credit transaction.

15 U.S.C. § 1605(d)(1).

Thus, a "recording fee" that exceeds the actual fee paid to record the instrument is a finance charge and a point and fee. *Payton v. New Century Mortg. Corp.*, 2003 WL 22349118 (N.D.Ill.). As stated above, Plaintiffs were charged a flat fee of $120 for "recording fee" when the actual fee paid to record the mortgage was $49. The $71 markup is a finance charge and, therefore, a point and

fee.

**What is the "Total Loan Amount"**

The "total loan amount" is calculated by subtracting from the amount financed any fees which should have been but were not included in the finance charge. Official Staff Commentary to 12 C.F.R § 226.32(a)1)(ii); *see also, Jones v. Aames Funding Corporation*, 2006 WL 2845689 (E.D. Pa. 2006); *Jones v. Novastar Mortgage, Inc.*, 2006 WL 2707349 (W.D. Mo. 2006); *Hays v. Bankers Trust Co.*, 46 F. Supp.2d 490 at 498 n. 14 (S.D.W. Va. 1999). HLC's disclosed "amount financed" with respect to the Plaintiffs' loan was $37,104. (See Exhibit "E"). Application of the Official Commentary's convoluted definition of "total loan amount" will result in an amount less than the stated amount financed of $37,104. However, for purposes of determining whether this loan meets the HOEPA points and fee trigger, the Court need not determine the amount to be subtracted from the amount financed in order to calculate the total loan amount. As explained below, even assuming the "total loan amount" is the disclosed "amount financed," the loan meets the trigger.

**The Points and Fees Trigger is Met**

As stated, the "Total Loan Amount" of Plaintiffs loan is no greater than $37,104. The points and fees trigger is 8% of that amount, or $2,968.32. The finance charges which were disclosed by HLC (i.e., without regard to any mark-ups) totaled $2,946. (See Exhibit "E"). Therefore, HLC underwrote this loan just $22.32 shy of the HOEPA trigger ($2,968.32 - $2,946 = $22.32). This should give the Court an idea of how aggressive HLC's practices were regarding the imposition of fees. To meet the HOEPA trigger, Plaintiffs need only demonstrate that the real estate fees were marked up by at least $22.32. Considering only the $71 markup of the recording fee, the points and fees easily meet the 8% trigger. This is a HOEPA loan.

**PLAINTIFFS HAVE A RIGHT TO RESCIND AND CANNOT BE PREVENTED FROM ADJUDICATING THAT RIGHT.**

A right of rescission arises from a HOEPA loan where its provisions violate any of the substantive prohibitions contained Section 1639 or if the required HOEPA pre-closing disclosures are not provided. 15 U.S.C. § 1639(j).  HLC does not argue in its motion that a rescission right does not arise from the circumstances of the loan, nor does HLC seek summary judgment on that point.  Thus, Plaintiffs are under no burden of proof on this point.  It should be noted, however, that several aspects of the loan transaction give rise to the rescission right, as a matter of law.  As alleged in the Complaint, the Plaintiffs' loan agreement includes several provisions which are prohibited by HOEPA and its implementing regulations.  For example, the loan includes a pre-payment penalty which is prohibited by operation of 15 U.S.C. § 1639(c). (See Exhibit "B", p. 2).  Another prohibited provision is any right to demand payment prior to maturity, other than for the limited reasons set out in Regulation Z, Section 226.32(d)(8).  The Plaintiffs' mortgage contains at least two provisions in violation of that prohibition. (See Exhibit "J", ¶ ¶ 18 and 22).

The primary relief sought by HLC is a dismissal of the rescission claim based on the speculation that Plaintiffs can not afford to make a lump sum payment of the assumed balance owed under the loan.  HLC argues that this result is dictated by the discretion granted to the Court in Section 1635(b) to fashion an alternative to the procedures set out in that section.

The main problem with HLC's argument is that it confuses the *substantive* legal issue facing the Court (whether there exists a right to rescind) with the *procedural* questions not yet presented (if there is a right, what is the amount of tender due, do circumstances exist to justify a deviation from the procedure set out in Section 1635(b) and, if so, what should be the alternative procedure).

9

Whether Plaintiffs have a viable rescission claim is a function of the nature of the loan and the plain language of the applicable provisions of TILA and Reg. Z.  As set out above, the circumstances surrounding the loan clearly give rise to a rescission right.  As also stated above, HLC has not moved for summary judgment on this point.  It merely points out that it disputes that there is a rescission right.

Section 1635(a) and 1639(j) unambiguously set out the circumstances giving rise to the substantive right to rescind.  The Eleventh Circuit has made clear that a district court's discretion under Section 1635(b) should not be confused with a conditioning of the substantive right of rescission.  The Court clarified that the trial court's equitable powers to fashion a *procedure* for "effecting" the rescission remedy does not make the rescission any less "automatic" than as provided under Section 1635(a).

> Like the statute from which it was drawn almost word for word, § 226.23(d) does basically three things: first, it provides in subsection (d)(1) that rescission is automatic upon the consumer's notice; second, in subsections (d)(2) and (d)(3) it establishes a framework for the exchange of property; and third, in subsection (d)(4), it gives the courts the power to modify that framework consistent with the statutory objective. Subsection 226.23(d)(4)'s acknowledgment that the courts may modify the procedures prescribed in subsections (d)(2) and (d)(3), but not those of subsection (d)(1), is at once, then, **both a recognition of the court's power to change the statutory framework for *effecting* rescission and a reaffirmation of the Act's intent to make rescission *automatic* upon notification**. As one commentator has noted: "Paragraph 1 [of § 226.23(d) ] simply recognizes the statutory mandate that rescission is complete at the time of notice. Paragraph 4 restates the power given to courts under § 1635(b) to modify the statutory procedures outlined in paragraphs 2 and 3. ***Therefore, it is clear that there is no such thing as conditional rescission. Rather, there is simply recognition of the power of the courts to modify the procedure to effect the rescission.***"

Williams v. Homestake Mortgage Company, 968 F.3d 1137, 1141- 42 (11th Cir. 1992), *quoting*,

Daniel J. Morgan, *Rescission Under the Simplification Act: What's New (And Not So New) for*

*Creditors,* 7 Okla.City U.L.Rev. 355, 395 n. 265 (1982)(emphasis added).

The distinction between the substantive right of rescission and the Court's authority to fashion a procedure was also reinforced by the 2004 amendments to the Federal Reserve Board's Official Commentary to Reg. Z.

> 1. *Modifications.* The procedures outlined in [12 C.F.R.] § 226.23(d)(2) and (3) may be modified by a court. For example, when a consumer is in bankruptcy proceedings and prohibited from returning anything to the creditor, or when the equities dictate, a modification might be made. *The sequence of procedures under § 226.23(d)(2) and (3), or court's modification of those procedures under § 226.23(d)(4), does not affect a consumer's substantive right to rescind and to have the loan amount adjusted accordingly. Where the consumer's right to rescind is contested by the creditor, a court would normally determine whether the consumer has a right to rescind and determine the amounts owed before establishing the procedures for the parties to tender any money or property.*

69 Fed. Reg. 16,769, 16,774 (2004)(emphasis added).

The *Williams* court also emphasized the importance of the rescission right as a pro-consumer enforcement tool, to be applied consistent with the remedial purposes of TILA.

> The sequence of rescission and tender set forth in § 1635(b) is a reordering of common law rules governing rescission. Under common law rescission, the rescinding party must first tender the property that he has received under the agreement before the contract may be considered void. 17A Am.Jur.2d *Contracts* § 590, at 600-01 (1991). Once the rescinding party has performed his obligations, the contract becomes void and the rescinding party may then bring an action in replevin or assumpsit to insure that the non-rescinding party will restore him to the position that he was in prior to entering into the agreement, i.e., return earnest money or monthly payments and void all security interests. *Id.* § 604, at 610-13. *Under § 1635(b), however, all that the consumer need do is notify the creditor of his intent to rescind. The agreement is then automatically rescinded and the creditor must, ordinarily, tender first.* Thus, rescission under § 1635 "place[s] the consumer in a much stronger bargaining position than he enjoys under the traditional rules of rescission." Note, *Truth-in-Lending: Judicial Modification of the Right of Rescission,* 1974 Duke L.J. 1227, 1234 (1974). Furthermore, because rescission is such a painless remedy under the statute (placing all burdens on the creditor), *it acts as an important enforcement tool, insuring creditor compliance with TILA's disclosure requirements.*

Id., at 1140 (emphasis added).  The court reminds us in the exercise of the trial court's discretion

to fashion a remedy "rescission must also maintain its vitality as an enforcement tool." *Id.* at

1142.

HLC asks this Court to exercise its authority under Section 1635(b) to extinguish the

substantive right to rescind.  This is exactly what the Eleventh Circuit held could not be done.  If

the law allowed what HLC proposes (the dismissal of the rescission claim upon the mere

suggestion that a plaintiff can not afford a "simultaneous" lump sum tender), then rescission right

would not only lose the "automatic" nature dictated by Section 1635(a), it would also lose all

"vitality as an enforcement tool."  HLC would turn this decidedly pro-consumer rescission right

on its head to become nothing more than a pro-lender right to receive early pay-off of its loan

while leaving its lien in tact.  HLC's view places the lender's interest in preserving its lien above

all other considerations.  HLC asks this Court to condition the rescission right on the Plaintiffs'

ability to pay off the loan in lump sum while the existing lien remains in place.  Plaintiffs would

have to raise a lump sum payment without having any access to the equity in their home which

would have been created by the rescission.  This is something few Americans would be able to

do.  The result of this approach would be an affront to the plain language of Section 1635(a), as

well as the remedial purposes of TILA and specifically the rescission rights granted therein.  In

HLC's view, as long as a borrower was impoverished enough for the Court to assume he could

not pay-off the lender "simultaneously" in one lump sum, there would be no rescission right at

all; thus allowing the lender to avoid all consequences for its failure to comply with TILA.  As

long as the lender victimized the relatively poor, there would be no consequences to its actions.

It would be repugnant to the purposes of TILA (not to mention its language) to adopt an

interpretation which would render the rescission right meaningful only to those wealthy consumers who happen to have enough cash in their bank accounts to pay, up front, the amount due under their mortgage in lump sum.

**HLC'S REQUEST FOR ALTERNATIVE REMEDIES IS PREMATURE AND NOT AN APPROPRIATE SUBJECT OF RULE 56.**

HLC's seeks, as an alternative to dismissal, one of three proposed alternative procedures. This aspect of HLC's motion is inappropriately premature.  Furthermore, the request is not an appropriate subject of Rule 56.  Rule 56 contemplates judgment on all or part of a "claim, counterclaim, or cross-claim..."  HLC's request address a procedural remedy effecting a substantive right which this Court has yet to establish.

The last sentence of the Commentary quoted above, describes the proper sequence of issues to be addressed in rescission:

> Where the consumer's right to rescind is contested by the creditor, a court would normally determine whether the consumer has a right to rescind and determine the amounts owed before establishing the procedures for the parties to tender any money or property.

Id.

As stated above, the Court has yet to determine whether the substantive right to rescind exists.  Once that determination is made and assuming it is made in Plaintiffs' favor, the Court must then decide at least the following issues in order to fashion a remedy consistent with the substantive right:

> -The amount of payments made by Plaintiffs to HLC which must be repaid by HLC to Plaintiffs;

> -Whether the reimbursement to Plaintiffs should be made as a separate payment from HLC or in the form of a credit against the outstanding principal balance;

-Whether there exist circumstances which justify a deviation from the procedure set out in Section 1635(b);

-The extent of the tender, if any, owed by the Plaintiffs back to HLC;

-What would be an appropriate method of satisfying the Plaintiffs' tender obligations given Congress' mandate that any such payment not be "impracticable or inequitable?" (See Section 1635(b))

It is the undersigned's experience in litigating and settling rescission cases that many, if not all, of the basic facts surrounding a remedy should be established by agreement, once the dispute of whether the substantive rescission right is resolved.

In any event, the fashioning of any of the alternative remedies suggested by HLC at this stage, and merely on the suggestion by HLC that Plaintiffs' are financially unable to pay a tender, is premature and inappropriate.  To illustrate this, Plaintiffs' would point out that their home has an appraised value of at least $44,500.  (See the Appraisal attached hereto as Exhibit "K"). There is no reason to assume that, once the HLC lien is removed from their property, Plaintiffs could use the equity to finance a loan sufficient to pay whatever amount this Court determines is due to HLC.  In his Affidavit, Jerome Williams states that he would expect to be able to obtain a loan for that purpose under those circumstances. (See Exhibit "A").  One way this could be approached would be for the Court to require the parties to attempt to agree on the basic facts which will dictate the amounts of credit due from HLC to Plaintiffs and *vis versa* (i.e., the amounts of payments made, prepaid closing costs etc....)[4].  Once those basic facts were established, the Court could order HLC to produce a Payoff Statement reflecting the appropriate credits due to Plaintiffs which would reduce the amount required to retire the debt.  Armed with

---

[4]In the unlikely event that the parties could not agree on these objective facts, the Court would have to take evidence and make a determination.

14

the Payoff Statement, Plaintiffs would be in a good position to arrange for refinancing of the amount required to retire the debt, assuming they are given a reasonable time to do so.

This is just one suggestion of a procedure which would pay respect to both parties' rights and obligations under Section 1635, while at the same time preserving the Plaintiffs' substantive rights and Section 1635's role as "an important enforcement tool, insuring creditor compliance with TILA's disclosure requirements." *Williams*, at p. 1140.

Plaintiffs stand ready to suggest and propose other methods of satisfying their tender obligations once the Court has determined that their loan is subject to a rescission right and has determined what the tender amount should be. However, such issues are not appropriately addressed at this time.

## CONCLUSION

For all the reasons stated above, HLC's motion is due to be denied.

Respectfully submitted this 28th day of November, 2007.

       s/ Kenneth J. Riemer
KENNETH J. RIEMER (RIEMK8712)
One of the Attorneys for Plaintiffs
Post Office Box 1206
Mobile, Alabama  366330
Telephone: (251) 432-9212
Fax Number: (251) 433-7172
kjr@alaconsumerlaw.com

## <u>CERTIFICATE OF SERVICE</u>

  I hereby certify that on November 28, 2007, I electronically filed the foregoing with the Clerk of the Court using the CM/ECF system which will send notification of such filing to the counsel of record.


               ____s/Kenneth J. Riemer_____
               KENNETH J. RIEMER (RIEMK8712)

16